## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

KEVIN NEAL,

|                    |   |                                      |
|--------------------|---|--------------------------------------|
| Petitioner,        | : | Case No. 3:04-cv-266                 |
|                    |   | District Judge Thomas M. Rose        |
| -vs-               |   | Chief Magistrate Judge Michael R. Merz |

ERNIE MOORE, Warden

Respondent.                    :

---

## REPORT AND RECOMMENDATIONS
---

Petitioner Kevin Neal brought this habeas corpus action pursuant to 28 U.S.C. § 2254 to challenge his conviction on two counts of aggravated murder with associated offenses and consequent sentence of life imprisonment without the possibility of parole plus seven years.

Mr. Neal, who is represented by counsel, pleads the following grounds for relief:

> **Ground One:** Mr. Neal's constitutional rights to due process, as guaranteed by the Fifth and Fourteenth Amendments, and to a fair trial, a jury trial, and the equal protection of the law, as guaranteed by the Sixth and Fourteenth Amendments, were violated when, over objection, an alternate juror remained with the jury during deliberations resulting in an outcome adverse to Mr. Neal.

> **Supporting Facts:** Over the objections of defense counsel, the trial court ordered the alternate juror to remain in the jury room during deliberations resulting in an outcome adverse to Mr. Neal.

> **Ground Two:** Mr. Neal's rights under the Due Process Clause of Section 1, Fourteenth Amendment to the U. S. Constitution, were

1

violated when the trial court denied Mr. Neal's motion for a new trial.

**Supporting Facts:** Mr. Neal filed two motions for a new trial. Supporting both motions were affidavits from two different witnesses saying they had overheard State's witness George Hawkins confess that he had lied at Mr. Neal's trial. The State anchored its theory of motive in this capital case to the testimony of Mr. Hawkins, a jailhouse snitch who faced a year in jail at the time of his trial testimony (following his testimony against Mr. Neal, Mr. Hawkins was sentenced to time served – fifty-two days). Solid evidence that Mr. Hawkins was lying presented a strong probability of a different result at trial. Nevertheless, the trial court denied both motions for new trial. This was error, and violated Mr. Neal's right to due process under the Fourteenth Amendments.

**Ground Three:** Mr. Neal was denied his right to the effective assistance of counsel and a fair trial. Trial counsel failed to challenge for cause a juror who admitted in voir dire that she believed Mr. Neal was guilty. Trial counsel's actions deprived Mr. Neal of his rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

**Supporting Facts:** Juror Cynthia Ann Rosales testified in voir dire that she thought Mr. Neal was guilty of the charges against him. Trial counsel apparently believed that Ms. Rosales might be unlikely to vote for death in a potential penalty phase of the case. Faced with a choice between seating a juror who believed his client guilty or excusing a juror he believed might spare his client's life, trial counsel passed for cause and admitted on the record that his decision was solely driven by his consideration of the ultimate penalty. In so doing, trial counsel abandoned his client's right to a fair and impartial jury.

**Ground Four:** Mr. Neal's rights under the Due Process Clause of the Fourteenth Amendment were violated when the prosecutor called attention to Mr. Neal's invocation of his right to counsel.

**Supporting Facts:** On July 12, 1997, Mr. Neal was interrogated by law enforcement. Prior to interrogation, Mr. Neal was informed of and waived his Miranda rights. During the interrogation, Mr. Neal ultimately said, "I probably ought to talk to an attorney." Over objection, the State elicited this fact from a law enforcement witness at trial.

**Ground Five:** Mr. Neal was denied his rights to due process, a fair

trial, and an impartial jury as guaranteed by the Sixth and Fourteenth Amendments when the trial court denied a change of venue and seated jurors with knowledge of inadmissible and prejudicial facts about Mr. Neal.

**Supporting Facts:** Before voir dire, defense counsel moved for a change of venue due to extensive pretrial publicity. Counsel renewed that motion after the close of voir dire. The trial court improperly denied that motion and several valid challenges for cause. The combined effect of these errors denied Mr. Neal his rights to due process, a fair trial, and an impartial jury. Some jurors had knowledge of inadmissible aspects of Mr. Neal's past. One juror openly stated that she thought Mr. Neal was guilty. Another juror's daughter had been molested by a family member and, in a separate incident, the same juror's aunt, uncle, and a five-year-old cousin were murdered.

**Ground Six:** Mr. Neal was denied his rights under the Due Process Clause of the Fourteenth Amendment when the trial court accepted the jury's guilty verdict in the absence of sufficient evidence to support the convictions.

**Supporting Facts:** The State simply did not prove that Mr. Neal had anything to do with this disappearance of murder of the children. The State did not prove that whoever killed the children did so with prior calculation and design. The State never proved how or where the children were killed. The State's theory of the case is contradicted by the lack of certain forensic evidence. The blue blanket that is supposed to have contained the children's freshly killed bodies contained no evidence of those bodies. The maroon car that is supposed to have transported the blue blanket with the bodies in it contained no evidence of those bodies and no evidence of the blue blanket.

The State's own argument in the Ohio court of appeals concerning cause of death is perhaps the best commentary on the condition of its evidence. After eliminating suicide, natural causes, or accident, the State averred that homicide was the only option:

> [s]omeone caused their deaths by homicide. Whether by aggravated murder or other homicide is the issue in the other elements of the charged offense. At this point, assuming that the other evidence shows Kevin Neal to be the someone, that he cause the death is

3

demonstrated by the fact that he has never put forward an affirmative defense of accidental death of both children at the same time or to suggest that both children died of natural causes simultaneously.

**Ground Seven:** The cumulative effect of trial error rendered Mr. Neal's capital trial unfair, requiring a new trial. Fifth, Sixth, and Fourteenth Amendments, U.S. Constitution.

**Supporting Facts:** Each foregoing ground for relief is sufficient to warrant the issuance of a Writ. Combined with the following list of errors not included in separate grounds for relief, the cumulative impact of all the errors rendered Mr. Neal's trial fundamentally unfair:

1.      In opening statement, the State relied on a letter purportedly written by Kevin Neal as one of its four pieces of support for motive but never laid a proper foundation for its admission. After denying the State permission to read the letter to the jury, the trial court allowed it to go back to the jury with the other exhibits at the close of trial.

2.      The trial court erred in allowing the unredacted consent-to-search form – containing references to items that were never found at the Neal residence – to go back to the jury.

3.      At several points throughout the trial, the court allowed the admission of hearsay, in violation of Mr. Neal's rights to due process and to confront the witnesses against him:

    a.      Over objection, Agent Trombitas testified as to what kinds of items Sue Neal said she thought the children would buy in a store, in order to cast doubt on the accuracy of reported sightings of the children in another town after their disappearance.

    b.      Over objection, Sheriff Deskins testified to learning, as a result of his investigation, that the grave of Sue Neal's mother was located some 94 feet from the spot where the children's bodies were found. This was the only evidence of the location of the grave. The State repeatedly argued proximity of the grave to the bodies as proof that Mr. Neal had left the bodies there.

4

      c.      The trial court agreed that the State was wrong to offer the hearsay testimony of Dr. Twig through State's witness Anne Daniel – but allowed it anyway.

      d.      Detective Neal testified about both sides of a conversation she allegedly had with Sue Neal regarding problems in the Neal marriage. Detective Gould also testified about her conversations with Libby Wyatt and Carolyn Gragg about their conversations with Mr. and Mrs. Neal.

      e.      Over objection, the trial court admitted the affidavits of Ms. Gragg and Ms. Wyatt. Both are hearsay; the Wyatt affidavit contains references to polygraphs allegedly taken by the Neals.

      f.      Over objection, Sheriff Deskins testified that, while Ms. Neal had "supported Kevin more than not, [t]here are times she waffles back and forth." Sue Neal could not have testified that "I think Kevin did it" or "sometimes I think Kevin did it."

      g.      Over objection, George Hawkins testified about his own alleged statement to Officer Atwood: "I think Kevin Neal killed . . . ." Mr. Hawkins's [sic] is irrelevant.

      The cumulative effect of all these errors denied Mr. Neal a fair trial.

(Petition, Doc. No. 1, Addendum at 5-7.)

      Respondent does not claim that any of Petitioner's grounds for relief are unexhausted, procedurally defaulted, or untimely raised in this Court. Instead, the State defends on the merits which this Court proceeds to analyze.

## Ground One

In Ground One, Petitioner claims his constitutional rights were violated when an alternate juror remained with the jury throughout deliberations in both the guilt and penalty phases of this capital trial.

As with all the grounds for relief, this claim was decided on the merits by the state courts. The Supreme Court has recently elaborated on the standard of review of such state court decisions in federal habeas corpus:

> The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas "retrials" and to ensure that state-court convictions are given effect to the extent possible under law.  See *Williams v. Taylor,* 529 U.S. 362, 403-404, 120 S.Ct. 1495, 146 L. Ed.2d 389 (2000).  To these ends, § 2254(d)(1) provides:

>> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

> As we stated in *Williams,* § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  529 U.S., at 404-405, 120 S.Ct. 1495.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  *Id.,* at 405-406, 120 S. Ct. 1495.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular

case. *Id.,* at 407-408, 120 S.Ct. 1495. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one. *Id.,* at 409- 410, 120 S.Ct. 1495. See also *id.,* at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

*Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 1849-50, 152 L. Ed. 2d 914 (2002).

The opinion of Judge Frederick Young for the Second District Court of Appeals on this claim is as follows:

The Sixth Amendment to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution guarantee a criminal defendant a trial by an impartial jury. When a guilty verdict is returned, that requires the jury's unanimous verdict to be the product of the deliberations of those who subscribe to it. When a stranger is admitted into the deliberation process, that requirement and the goal of a verdict rendered by an impartial jury is undermined. Crim. R. 24(F)(1) implements the constitutional right to an impartial jury by requiring the court to discharge any remaining alternate jurors when the jury retires to consider its verdict. The purpose of the rule is to prevent the alternate from adding his views and arguments during deliberations when he or she cannot join in the verdict. The Ohio Supreme Court has held that it is error for an alternate to be permitted to sit in during the jury deliberations, even if given instructions by the trial court not to participate in the deliberations. State v. Murphy, 91 Ohio St.3d 516, 531-32, 2001 Ohio 112, 747 N.E.2d 765; State v. Jackson, 92 Ohio St.3d 436, 439, 2001 Ohio 1266, 751 N.E.2d 946.

However, the Murphy Court held that this error does not amount to plain error if the defendant failed to raise an objection to the alternate's presence during jury deliberations. Id., 91 Ohio St.3d at 533-34; see also, Jackson, supra at 439-440. In reaching its conclusion, the Murphy Court heavily relied on a similar U.S. Supreme Court case, United States v. Olano (1993), 507 U.S. 725, 730, 123 L. Ed. 2d 508, 113 S. Ct. 1770, in which the Court addressed the error as a violation of Federal Rule of Criminal Procedure 24(c), which required alternates to be discharged after the

jury retires to consider its verdict. Federal Rule of Criminal Procedure 24(c) is similar to Crim. R. 24(F), which provides, "an alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." However in capital cases, it is permissible "for a court to retain alternates after the jury retired in the guilt phase and to substitute one of them for a regular juror who became incapacitated after the guilty verdict but before the jury retired to deliberate in the penalty phase." Murphy, supra at 531.

Certain fundamental constitutional errors known as structural errors are not subject to harmless error analysis. State v. Esparza, 74 Ohio St.3d 660, 661, 1996 Ohio 233, 660 N.E.2d 1194, citing Arizona v. Fulminante (1991), 499 U.S. 279, 113 L. Ed. 2d 302, 111 S. Ct. 1246. Structural errors have been found to affect "the entire conduct of the trial from beginning to end" and "the framework within which the trial proceeds." Fulminante, supra at 309-310. Several courts in other jurisdictions have held that an alternate remaining with the jury during deliberations is a structural error and not subject to harmless error analysis. United States v. Beasley (C.A 10 1972), 464 F.2d 468, 470; Commonwealth v. Krick (Penn. 1949), 164 Pa. Super. 516, 67 A.2d 746, 749; Commonwealth v. Smith (Mass. 1988), 403 Mass. 489, 531 N.E.2d 556, 560; Brigman v. State (Okla. Crim. App. 1960), 1960 OK CR 18, 350 P.2d 321, 323; State v. Bindyke (N.C. 1975), 288 N.C. 608, 220 S.E.2d 521, 533.

However, the sixth federal circuit has held that the alternate juror is not a stranger in the jury room and that the alternate juror's presence in the jury deliberations does not amount to a structural error. Potter v. Perini (1976), 545 F.2d 1048. Further, the seventh federal circuit has held that an alternate sitting in with the jury during deliberations was not structural error, but that "jury privacy is not a constitutional end in itself; it is, rather a means of insuring the integrity of the jury trial." Johnson v. Duckworth (1981), 650 F.2d 122, 125. Therefore, the defendant would need to show he was prejudiced by the violation of Crim. R. 24(F)(1) in order to merit setting aside the jury's verdict. See Koch v. Rist, 89 Ohio St.3d 250, 252, 2000 Ohio 149, 730 N.E.2d 963; State v. Hessler, 90 Ohio St.3d 108, 2000 Ohio 30, 2000 Ohio 31, 734 N.E.2d 1237. Prejudice is not presumed merely because a stranger invades the sanctity of the jury deliberations. Rist, supra. The Duckworth court found that the alternate's presence during the jury deliberations was not the type of invasion of the jury's privacy that would tend to stifle the jury's debate and endanger the right to trial by jury. Id., 650 F.2d at 125. The Duckworth court found that

8

alternate jurors were particularly unique as they are indistinguishable from the other jurors in all aspects except being excluded from the deliberations and vote. Id., 650 F.2d 122 Thus, the alternate juror has no more and no less information than the other jurors and is neither more biased or unduly influenced than the other jurors. Id., 650 F.2d 122

For all constitutional errors except for structural errors, in which an objection was properly lodged at trial, the reviewing court must apply Federal Criminal Rule 52(a)'s harmless error analysis and the court should disregard all errors which are harmless beyond a reasonable doubt. State v. Hill, 92 Ohio St.3d 191, 196-197, 2001 Ohio 141, 749 N.E.2d 274, citing California v. Chapman (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824. Federal Criminal Rule 52(a) and Ohio's Crim. R. 52(A) both define the harmless error analysis as "any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." To say that an error did not affect a substantial right is generally to say that the error was not prejudicial, meaning that it must not have affected the outcome of the proceedings. See Olano, supra at 734.

Further, Ohio's Evidence Rule 606(B) enacts the evidence "aliunde" doctrine, which holds that a jury's verdict may be impeached in situations where foundational evidence from sources other than the jurors themselves is presented which creates at least a prima facie case that extraneous prejudicial information was considered by the jury or that some external influence was brought to bear on the jury. Evid. R. 606(B) permits the court to inquire of the jurors concerning those matters but not as to any matter or statement occurring during deliberations or to the effect of anything on his mind or emotions that influenced his verdict. Additionally, Evid. R. 606(B) applies to alternate jurors as well. Hessler, supra at 123.

On appeal, Appellant urges this court to find that placing an alternate with a jury during deliberations amounts to a structural error and is not subject to harmless error analysis. However, the State asserts that although it was error to permit the alternate to remain with the jury for deliberations, this error was merely a trial error, not a structural error and thus subject to harmless error analysis. Further, the State argues that the error was harmless and that the verdict should not be reversed. We agree with the Duckworth court and find that allowing an alternate to be present during jury deliberations does not amount to a structural error but is a trial error subject to harmless error analysis.

9

> The Ohio Supreme Court has recently held that the State has the burden to demonstrate an absence of prejudice when, over objection, alternates are present in jury deliberations. State v. Gross, 97 Ohio St. 3d 121, 2002 Ohio 5524, at 153, 776 N.E.2d 1061. In arguing that the error here was harmless, the State predominantly relies on the presumption of regularity which presumes that jurors follow the instructions given them by the trial court to argue that no prejudice occurred as a result of the alternate's presence during the jury deliberations. In the case before us, unlike that in Gross, supra, there is no evidence that the alternate "inserted himself into the actual deliberations" (Id.) whether verbally or nonverbally. In Gross, the Supreme Court held that "reversible error occurs where, over objection, an alternate juror participates in jury deliberations resulting in an outcome adverse to a defendant." In Gross, there was "specific evidence of active disruption of deliberative process that poses a significant risk of affecting jury functions - a risk that carries presumptive prejudice that the State has failed to counter." Id., 97 Ohio St. 3d at 154. Since there is no evidence in the case before us that the alternate participated in any way in the jury's deliberations, we find the State has met its burden of proof, and the error is harmless beyond a reasonable doubt.

*State v. Neal*, 2002 Ohio 6786, ¶¶73-80, 2002 Ohio App. LEXIS 6572 (Ohio App. 2nd Dist., 2002).

Petitioner's burden is to show that this is an unreasonable application of clearly established federal law. This he has failed to do. First of all, Judge Young correctly cites *Potter v. Perini*, 545 F.2d 1048 (6th Cir. 1976), and *Johnson v. Duckworth*, 650 F.2d 122 (7th Cir. 1981), for the proposition that allowing an alternate juror to remain is not a structural error automatically requiring reversal without analysis of whether the error was harmless. *See, Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). Secondly, he found that there was no evidence in the record that the alternate juror had, contrary to instructions, participated in any way in the deliberations. Thus there was no proof of any prejudice from the alternate's presence and therefore any error in allowing him to be present was harmless.

Petitioner argues that this conclusion is an unreasonable application of *United States v.*

10

*Olano*, 507 U.S. 725 (1993), but Petitioner's reliance on *Olano* is misplaced.  In that case, the Supreme Court dealt with a trial at which defendants had not objected to the presence of non-deliberating alternates.  The Court concluded that their presence was nonetheless a violation of Fed. R. Crim. P. 24.  However, the Court still required a showing of prejudice:

> Assuming arguendo that certain errors "affect substantial rights" independent of prejudice, the instant violation of Rule 24(c) is not such an error. Although the presence of alternate jurors does contravene "'the cardinal principle that the deliberations of the jury shall remain private and secret,'" Advisory Committee's Notes on Fed. Rule Crim. Proc. 23(b), 18 U. S. C. App., p. 785 (quoting United States v. Virginia Erection Corp., 335 F.2d 868, 872 (CA4 1964)), the primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence. "If no harm resulted from this intrusion [of an alternate juror into the jury room,] reversal would be pointless." United States v. Watson, 669 F.2d 1374, 1391 (CA11 1982). We generally have analyzed outside intrusions upon the jury for prejudicial impact. See, e. g., Parker v. Gladden, 385 U.S. 363, 17 L. Ed. 2d 420, 87 S. Ct. 468 (1967) (per curiam) (bailiff's comments to jurors, such as "Oh that wicked fellow he is guilty," were prejudicial); Patton v. Yount, 467 U.S. 1025, 81 L. Ed. 2d 847, 104 S. Ct. 2885 (1984) (pretrial publicity was not prejudicial); Holbrook v. Flynn, 475 U.S. 560, 89 L. Ed. 2d 525, 106 S. Ct. 1340 (1986) (presence of uniformed state troopers in courtroom was not prejudicial). A prime example is Remmer v. United States, 347 U.S. 227, 98 L. Ed. 654, 74 S. Ct. 450 (1954), where an outsider had communicated with a juror during a criminal trial, appearing to offer a bribe, and the Federal Bureau of Investigation then had investigated the incident. We noted that "the sending of an F. B. I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror," and remanded for the District Court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." Id., at 229-230.
>
> This "intrusion" jurisprudence was summarized in Smith v. Phillips, 455 U.S. 209, 71 L. Ed. 2d 78, 102 S. Ct. 940 (1982):

"Due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . It is virtually impossible to shield jurors from every contact or influence that might theoretically affect

their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Id., at 217.

There may be cases where an intrusion should be presumed prejudicial, see, e. g., Patton, supra, at 1031-1035; Turner v. Louisiana, 379 U.S. 466, 13 L. Ed. 2d 424, 85 S. Ct. 546 (1965), but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict? We cannot imagine why egregious comments by a bailiff to a juror (Parker) or an apparent bribe followed by an official investigation (Remmer) should be evaluated in terms of "prejudice," while the mere presence of alternate jurors during jury deliberations should not. Of course, the issue here is whether the alternates' presence sufficed to establish remedial authority under Rule 52(b), not whether it violated the Sixth Amendment or Due Process Clause, but we see no reason to depart from the normal interpretation of the phrase "affecting substantial rights."

The question, then, is whether the instant violation of Rule 24(c) prejudiced respondents, either specifically or presumptively. In theory, the presence of alternate jurors during jury deliberations might prejudice a defendant in two different ways: either because the alternates actually participated in the deliberations, verbally or through "body language"; or because the alternates' presence exerted a "chilling" effect on the regular jurors. See Watson, supra, at 1391; United States v. Allison, 481 F.2d 468, 472 (CA5 1973). Conversely, "if the alternate in fact abided by the court's instructions to remain orally silent and not to otherwise indicate his views or attitude . . . and if the presence of the alternate did not operate as a restraint upon the regular jurors' freedom of expression and action, we see little substantive difference between the presence of [the alternate] and the presence in the juryroom of an unexamined book which had not been admitted into evidence." Id., at 472.

Respondents have made no specific showing that the alternate jurors in this case either participated in the jury's deliberations or "chilled" deliberation by the regular jurors. We need not decide whether testimony on this score by the alternate jurors or the regular jurors, through affidavits or at a Remmer-like hearing, would violate Federal Rule of Evidence 606(b), compare Watson, supra, at 1391-1392, and n. 17, with United States v. Beasley, 464 F.2d 468 (CA10 1972), or whether the courts of appeals have authority to remand for Remmer-like hearings on plain-error review. Respondents have never requested a hearing, and thus the record before us contains no direct evidence that the alternate jurors influenced the verdict. On this record, we are not persuaded that the instant violation of Rule 24(c) was actually prejudicial.

Nor will we presume prejudice for purposes of the Rule 52(b) analysis here. The Court of Appeals was incorrect in finding the error "inherently prejudicial." 934 F.2d at 1439. Until the close of trial, the 2 alternate jurors were indistinguishable from the 12 regular jurors. Along with the regular jurors, they commenced their office with an oath, see Tr. 212 (Mar. 2, 1987), received the normal initial admonishment, see id., at 212-218, heard the same evidence and arguments, and were not identified as alternates until after the District Court gave a final set of instructions, see App. 89-90. In those instructions, the District Court specifically enjoined the jurors that "according to the law, the alternates must not participate in the deliberations," and reiterated, "we are going to ask that you

not participate." Ibid. The Court of Appeals should not have supposed that this injunction was contravened. "[It is] the almost invariable assumption of the law that jurors follow their instructions. " Richardson v. Marsh, 481 U.S. 200, 206, 95 L. Ed. 2d 176, 107 S. Ct. 1702 (1987). "[We] presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." Francis v. Franklin, 471 U.S. 307, 324, n. 9, 85 L. Ed. 2d 344, 105 S. Ct. 1965 (1985). See also Strickland v. Washington, 466 U.S. 668, 694, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) (in assessing prejudice for purposes of ineffective-assistance claim, "a court should presume . . . that the judge or jury acted according to law"). Nor do we think that the mere presence of alternate jurors entailed a sufficient risk of "chill" to justify a presumption of prejudice on that score.

*United States v. Olano*, 507 U.S. 725, 737-41 (1993). Thus the *Olano* Court, interpreting the Federal Rules of Criminal Procedure rather than the Constitution, found there was no reversible error in the absence of proof of prejudice. Petitioner turns this into a holding that the State must prove the alternate did not participate which it cannot do because the record is silent. That is simply not a correct reading of *Olano*. First of all, *Olano* does not hold that a State must do anything – it is not a constitutional case. Secondly, it does not place any such burden on either a federal or state prosecutor. Instead, the Court concludes "In sum, **respondents** have not met their burden of showing prejudice under Rule 52(b)." *Id.* at 741 (emphasis added). That conclusion cannot possibly be read as placing a burden on the prosecution.

Petitioner emphasizes that his counsel objected to the alternates' presence and counsel in *Olano* did not, but this is irrelevant: the presence or absence of an objection does not touch upon the question of prejudice.

Petitioner admits there is no proof the alternates participated in any way. In the absence of such proof, there is no showing of prejudice. Petitioner has also not shown that the alternates presence violated some federal constitutional right, as opposed to Ohio R. Crim. P. 24. But even if there were such a right, its violation here was harmless, because Petitioner has not shown any

13

prejudice.

Ground One for Relief is without merit.

## Ground Two

In his second ground for relief, Petitioner asserts his due process rights were violated when his motions for new trial were denied. The basis for the motions was that Petitioner had obtained affidavits from two persons who claimed that a principal witness against Petitioner had recanted his testimony. The Common Pleas Court, when it decided the motions, had before it a new affidavit from the trial witness, a Mr. Hawkins, in which he reaffirmed his trial testimony and averred that he had received no consideration from the State for the testimony. The Court of Appeals found that, under these circumstances, denying the motions was not an abuse of discretion. *State v. Neal*, ¶¶ 52-58.

Although Petitioner argues his due process rights are involved, he cites no Supreme Court authority requiring a motion for new trial to be granted by a state court under particular circumstances. In fact, it does not appear that this claim was presented to the Ohio Court of Appeals as a federal constitutional claim. Even if it were an abuse of discretion, abuse of discretion is not a denial of due process *Sinistaj v. Burt,* 66 F. 3d 804 (6th Cir. 1995).

Furthermore, this Court finds no abuse of discretion. The recanting of trial testimony by prosecution witnesses is viewed with the "utmost suspicion." *Bowers v. Curtis*, 118 Fed. Appx. 901; 2004 U.S. App. LEXIS 26627 (6th Cir. 2005), *quoting Hence v. Smith*, 37 F. Supp. 2d 970, 981 (E.D. Mich. 1999)(*quoting United States v. Kearney*, 682 F. 2d 214, 219 (D.C. Cir. 1982)). Even if

14

accepted, a post-trial recantation is generally not sufficient to grant habeas relief absent constitutional error.  *Id.* at 980.  Here we have not a verified recantation, but mere hearsay evidence of recantation,  followed by reaffirmation by the witness himself.

The second ground for relief is without merit.

## Ground Three

Petitioner has withdrawn Ground Three (Traverse, Doc. No. 12, at 5).

## Ground Four

In his fourth ground for relief, Petitioner asserts his due process rights were violated when the law enforcement officer who had interrogated him was permitted to testify that he said he "probably ought to talk to a lawyer."  This was the third assignment of error on direct appeal and the Court of Appeals held:

> Appellant argues that the trial court erred in admitting evidence that he had invoked his right to counsel. We disagree.
>
> An individual's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the individual's invocation of his right to remain silent is used to imply proof of guilt. Doyle v. Ohio (1976), 426 U.S. 610, 619, 49 L. Ed. 2d 91, 96 S. Ct. 2240. Testimony that the defendant asked for an attorney when made only to indicate what occurred at the time, without further use by the prosecutor in argument or where the comment was mentioned only briefly, has been held not to be error or only harmless error. State v. Gunn (Aug. 7, 1998), Montgomery, App. No. 16617, 1998 Ohio App. LEXIS 3593; State v. Lanier (Aug. 2, 1996), Ottawa App. No. OT-95-051, 1996 Ohio App. LEXIS 3286.

If a suspect in a criminal investigation requests counsel at any point during an interrogation, the interrogation cannot continue until a lawyer is provided or the suspect reinitiates the interrogation. State v. Henness, 79 Ohio St.3d 53, 63, 1997 Ohio 405, 679 N.E.2d 686. However, invoking the right to counsel minimally requires a statement that can be reasonably construed as requesting an attorney's assistance. Id. The police officer need not cease questioning if the statement is ambiguous or equivocal such that a reasonable police officer might only have understood that the suspect might be invoking his right to counsel. Id. For example, the statements, "maybe I should talk to a lawyer," or "I think I need a lawyer," have been held to be insufficient to invoke the right to counsel. Davis v. United States (1994), 512 U.S. 452, 461, 129 L. Ed. 2d 362, 114 S. Ct. 2350; Henness, supra, 79 Ohio St.3d at 63.

At trial, Special Agent Robert Beedy of the Ohio Attorney General's office testified regarding an interview he conducted of Appellant with some officers with the Champaign County Sheriff's office. At the interview, Appellant was given his Miranda rights, which he waived. However, Mr. Beedy testified that as the interview became more intense Appellant stated, "* * * Well, then I probably ought to talk to an attorney * * *" and then he left the interview. (Tr. 3226-27). Appellant argues that this testimony by Agent Beedy was an impermissible use of Appellant's invocation of his right to counsel used to imply proof of guilt. We first note that Appellant's statement was not an invocation of his right to counsel. We find the statement "I probably ought to talk to an attorney" to be similar to "I think I need a lawyer," which the Henness court held was not an invocation of the right to counsel. Since Appellant's statement was not an invocation of the right to counsel, Agent Beedy's reiteration of the statement was not a comment on Appellant's exercise of a constitutional right. Moreover, as in Gunn and Lanier, Agent Beedy was simply relating why the interview ended, not intending to impeach Appellant or suggest his guilt. The admission of this testimony was not error and Appellant's third assignment of error is without merit and is overruled.

*State v. Neal*, 2002 Ohio 6786, ¶¶ 43-46 (Ohio Ct. App., 2002).

The critical United States Supreme Court precedent is *Doyle v. Ohio*, 426 U.S. 610, 619, 49

L. Ed. 2d 91, 96 S. Ct. 2240 (1976). In interpreting *Doyle*, the Second District Court of Appeals

relied on and expressly cited *Davis v. United States*, 512 U.S. 452 (1994), where the Supreme Court

held that "maybe I ought to talk to a lawyer" was not an invocation of *Miranda* rights. Petitioner

argues that "maybe" means "possibly" as distinct from probably, but surely finding what Petitioner

said to be close enough to what the defendant said in *Davis* is not an unreasonable application of

clearly established Supreme Court precedent. The fourth ground for relief is therefore without merit.

### Ground Five

In his fifth ground for relief, Mr. Neal complains of denial of his motion for change of venue

and the seating of several jurors whom he believes should have been excused for cause. This was

his first assignment of error on direct appeal, on which the Court of Appeals wrote as follows:

> Appellant argues that he did not receive an impartial jury because the
> trial court denied his motion for change of venue and failed to
> disqualify certain jurors. We disagree.
>
> a. Change of venue
>
> The determination whether or not to order a change in venue lies
> within the sound discretion of the trial court. State v. Gumm, 73 Ohio
> St.3d 413, 430, 1995 Ohio 24, 653 N.E.2d 253. An appellate court
> will not reverse a trial court's judgment on a change of venue motion
> absent a clear abuse of discretion. Id. An abuse of discretion occurs
> when a trial court acts in a manner which is unreasonable, arbitrary,
> or unconscionable. State v. Montgomery (1991), 61 Ohio St.3d 410,
> 413, 575 N.E.2d 167.
>
> The mere fact that there was extensive pretrial publicity does not
> require a change of venue under Crim. R. 18. State v. Treesh, 90
> Ohio St.3d 460, 463, 2001 Ohio 4, 739 N.E.2d 749. A reviewing
> court must examine a trial court's denial of a request for change of
> venue to determine whether a defendant's right to a fair trial was
> violated. State v. Lundgren, 73 Ohio St.3d 474, 1995 Ohio 227, 653
> N.E.2d 304. A fair trial merely requires a panel of impartial,

indifferent jurors. Id. at 479. "Unless a juror is challenged for cause, he or she is presumed to be impartial." State v. Williams, 79 Ohio St.3d 1, 4, 1997 Ohio 407, 679 N.E.2d 646. The best test of whether prejudicial pretrial publicity prevented obtaining a fair and impartial jury is a careful and searching voir dire. Treesh, supra at 463-64. Also, a trial court judge must make a good faith effort to seat a jury before granting a change in venue. State v. Fox, 69 Ohio St.3d 183, 189, 1994 Ohio 513, 631 N.E.2d 124. Where all the empaneled jurors either have not been exposed to pretrial publicity, or have not formed an opinion, or stated that they could set aside any opinion they had formed, and further where all state that they could render a fair and impartial verdict based on the law and the evidence, it is not error for the trial judge to deny a motion for a change of venue. Treesh, supra, 90 Ohio St.3d at 464.

In selecting a jury for Appellant's trial, 500 potential jurors were summoned and sent preliminary questionnaires. After several jurors were excused, the remaining jurors completed a detailed questionnaire. The trial court voir dired in person 55 potential jurors. The trial judge questioned each prospective juror and each juror was voir dired outside of the presence of the remaining jurors on the issues of pretrial publicity and attitudes about the death penalty.

Appellant complains about four specific jurors: Brenda Flynn, Judy Lattimer, Brenda Cook, and Cynthia Rosales. Appellant complains that Ms. Cook knew that Appellant had charges in Indiana for something and thought that they might be sexual in nature. However, Appellant failed to challenge Ms. Cook for cause. Additionally, Ms. Cook indicated that she had no preconceived notions about the trial and that she would set aside any previous information she thought she knew. (Tr. Vol. 7, 1753-55). Also, Appellant did not challenge Ms. Rosales for cause. Ms. Rosales stated that she believed Appellant was guilty and that sitting in the court room that day that she thought Appellant was guilty. However, Ms. Rosales continued on to state, under oath, that she would be fair and impartial and that she could set aside her belief of guilt and any information she had received from media reports. (Tr. Vol. 8, 1847-48).

As for Ms. Lattimer and Ms. Flynn, both were extensively questioned regarding their exposure to pretrial publicity. Both Ms. Flynn and Ms. Lattimer had the common knowledge that the children had been missing, then found dead, and that Appellant had been accused. Additionally, Ms. Lattimer knew that Appellant had been on trial in another state but mistakenly believed this involved his mother or

18

stepmother. Further, she stated that she had never expressed that she believed Appellant to be guilty but that she had heard others say so. Similarly, Ms. Flynn stated that she knew that Appellant had been on trial in another state and mistakenly thought it concerned his stepmother and some violence. Ms. Flynn was inaccurately mixing two separate events, but she stated that she had no details in her mind about these incidents. Also, Ms. Flynn stated that a fellow employee had told her that he believed Appellant was responsible. However, both Ms. Flynn and Ms. Lattimer took an express oath that they would be fair and impartial, that they had not formed an opinion as to guilt, and that they could set aside any information received from an out of court source, and base their decisions solely on what was presented in court. (Tr. Vol. 5, 1080-81; Vol. 7, 1609-11). We do not find that Appellant has demonstrated juror bias because each juror was specifically questioned regarding his or her individual responses and each juror swore that he or she could set aside all information previously heard and render a fair and impartial verdict. The trial court did not err in overruling Appellant's motion for change of venue.

b. Challenges for Cause on Jurors Lattimer and Flynn

An appellate court should only reverse a trial court's determination not to disqualify a juror on a challenge for bias if it finds that the trial court abused its discretion. Berk v. Matthews (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301. The trial court is in the best position to hear the prospective juror and to validate the juror's statements. State v. Murphy, 91 Ohio St.3d 516, 526, 2001 Ohio 112, 747 N.E.2d 765 (holding that juror could serve on a jury even though his cousin had been killed by a similar crime and who hesitated before stating that his cousin's death would not affect his impartiality). "A prospective juror is not automatically disqualified by the fact that a close relative has been the victim of a crime similar to the crime on trial." Id., 91 Ohio St.3d at 525. The trial court must make a determination on a case by case basis of whether the juror has a state of mind evincing enmity or bias. Id.

Appellant reiterates his argument that Ms. Flynn and Ms. Lattimer should have been stricken on the basis of pre-trial publicity, which was discussed above. Appellant also argues that the challenge against Ms. Lattimer should have been granted because her daughter, who was approximately the same age as Cody, had been sexually molested by a family member and, in a separate incident, her aunt, uncle, and five year old cousin had been murdered. Appellant argues that Ms. Lattimer could not have set aside these emotional factors in her background.

The State asserts Ms. Lattimer stated that although she had been close to her uncle and aunt, she had only met the mother of the five year old cousin once and had minimal contact with them. She had only heard a little about the murder proceedings, where the killer pleaded guilty. Although she stated that she had some concern about the length of sentence the killer received, nothing in her testimony indicated that she held enmity towards murderers. As to the molestation of her daughter, Ms. Lattimer did not discover the molestation until her daughter told her when she was an adult. Further, Ms. Lattimer's daughter decided not to do anything about the molestation. By the time of Appellant's trial, these were ancient events in Ms. Lattimer's life and her emotions were likely not as strong as if she had just discovered the abuse of her small child. Moreover, Ms. Lattimer expressly stated that neither event would impair or influence her thinking as a juror on this case. (Tr. Vol. 4, 880-81). Additionally, Ms. Lattimer swore under oath that she had no preconceived notions about how the case should resolve and that she could be fair and impartial. (Tr. Vol. 4, 882). We find that Ms. Lattimer's family history was even less troubling than the juror in Murphy and, like in Murphy, Ms. Lattimer stated her family history would not affect her impartiality. Ms. Lattimer's testimony does not reveal that her state of mind evinced an attitude of enmity or bias. We cannot say that the trial court abused its discretion in overruling Appellant's challenges for cause to Ms. Lattimer or Ms. Flynn. Appellant's first assignment of error is overruled.

*State v. Neal*, 2002 Ohio 6786, ¶¶29-37 (Ohio App. 2nd Dist., 2002).

Petitioner relies on several Supreme Court decisions for his change of venue claim. The Court has held that the level of pretrial publicity may be high enough that a change of venue is mandated. *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966)(carnival atmosphere prevented a fair trial); *Estes v. Texas,* 381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963)(airing of defendant's confession prevented the empaneling of an impartial jury).

However, courts should only presume prejudice where the "general atmosphere in the community or courtroom is sufficiently inflammatory." *DeLisle v. Rivers*, 161 F. 3d 370, 382 (6th

20

Cir. 1998).  Petitioner cites no record references to show the level of adverse pretrial publicity.  The

Sixth Circuit has found habeas not warranted in a number of cases with extensive adverse pretrial

publicity.  *See Ritchie v. Rogers*, 313 F. 3d 948 (6th Cir. 2002)(woman bludgeoned daughter to death

when she interrupted sex); *Nevers v. Killinger,* 169 F. 352, (6th Cir. 1999)(mayor of Detroit

declared on television that defendant police officer was guilty of murder); *Brofford v. Marshall*, 751

F. 2d 845, 848-52 (6th Cir. 1985); *Jenkins v. Bordenkircher*, 611 F. 2d 162 (6th Cir. 1979).  In *Nevers*,

the Sixth Circuit distinguishes the presumptively prejudicial cases (*Rideau, Sheppard, Estes*) from

those cases in which the court must weigh both the adverse pretrial publicity and the extent of voir

dire, citing *Murphy v. Florida,* 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2nd 589 (1975), and *Dobbert*

*v. Florida,* 432 U.S. 282, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977).

The Court of Appeals correctly held that it is the law in Ohio that a trial judge must attempt

to seat a jury before changing venue.

> Moreover, the interests of judicial economy, convenience, and
> reduction of public expenses necessitate that judges make a good
> faith effort to seat a jury before granting a change in venue. State v.
> Warner (1990), 55 Ohio St.3d 31, 46, 564 N.E.2d 18, 33; State v.
> Herring (1984), 21 Ohio App.3d 18, 21 OBR 19, 486 N.E.2d 119. "It
> has long been the rule in Ohio that 'the examination of jurors on their
> voir dire affords the best test as to whether prejudice exists in the
> community * * *.'" State v. Maurer (1984), 15 Ohio St.3d 239, 250-
> 251, 15 OBR 379, 389, 473 N.E.2d 768, 781, quoting State v. Swiger
> (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph
> one of the syllabus.

*State v. Fox*, 69 Ohio St. 3d 183, 189 (1994).  That is precisely what Judge Wilson did.  He

conducted extensive individual voir dire and was able to seat a jury of persons who either had no

prior knowledge or credibly swore that they could set it aside.

As Respondent notes, Petitioner's essential claim is that Juror Flynn's and Lattimer's statements that they could put aside what they knew and any potentially biasing experiences or attitudes are not to be believed.[1] The ultimate constitutional question is whether a juror swore that he or she could set aside any opinion that he might hold and decide the case on the evidence, and whether that juror's protestation of impartiality should have been believed. *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984). "The question of whether a trial court has seated a fair and impartial jury is a factual one, involving an assessment of credibility." *Gall v. Parker*, 231 F. 3d 265 (6th Cir. 2000), citing *Patton*. A trial court's finding of impartiality is a factual determination entitled to 28 U.S.C. 2254(e)'s presumption of correctness. *Dennis v. Mitchell,* 354 F. 3d 511, 520 (6th Cir. 2003). Both Juror Flynn and Juror Lattimer swore, persuasively to Judge Wilson, that they could be impartial. Petitioner has presented no clear and compelling evidence that Judge Wilson was wrong in believing them. Nor can it be said that the Court of Appeals unreasonably applied in clearly established federal law in upholding his decision. The fifth ground for relief is without merit.

**Ground Six**

In his sixth ground for relief, Petitioner asserts his convictions are not supported by sufficient

---

[1]In the relevant section of the Traverse, Petitioner also complains about Juror Rosales who believed that Petitioner was guilty. In his Third Ground for Relief in the Petition, Petitioner had claimed that it was ineffective assistance of counsel to permit Ms. Rosales to continue to serve, but Respondent had noted in the Return that this was an on-the-record decision of trial counsel to keep Juror Rosales because of the opinion she would not vote for the death penalty. In response, Petitioner withdrew his Third Claim. No further consideration is given to Juror Rosales in this Fifth Claim because it cannot have been error prejudicial to Petitioner to keep her on the jury when her counsel, in an admittedly strategic decision, wanted her kept on.

evidence.  This claim was presented, along with a claim that the verdict was against the manifest

weight of the evidence, as the sixth assignment of error on direct appeal, on which Judge Young

wrote:

> Appellant argues that the jury's verdict was against the manifest weight of the evidence and that the verdict was not based on sufficient evidence. We disagree.
>
> When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 175.
>
> In reviewing a challenge to the sufficiency of the evidence, we must determine whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the state had proven the essential elements of the crime beyond a reasonable doubt. See *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.
>
> An appellate court will defer to the trier of fact on determinations of witness credibility. *State v. DeHass* (1967) 10 Ohio St.2d 230, 227 N.E.2d 212. This includes determinations of expert witness credibility. *State v. Rose*, 144 Ohio App.3d 58, 66, 2001 Ohio 3297, P38, 759 N.E.2d 460.
>
> The State presented evidence that Appellant had motive to kill India and Cody. Appellant and Sue Neal had been having marital difficulties for several weeks preceding the disappearance of the children. (Tr. 3388-89). Appellant was highly upset about alleged infidelities by Sue Neal. (Tr. 3388-89; 3531-33, 3571). Appellant had told his sister-in-law that he would never visit her house because Sue Neal had "laid under another man" at her home. (Tr. 3571). Additionally, Appellant told a fellow inmate that he was interested in hurting Sue Neal rather than seeking revenge against the man with

23

whom she was unfaithful. (Tr. 3535). Appellant then specified that the way to hurt someone is to hurt someone they loved. (Tr. 3533, 3535). Further, on the morning of the disappearance, Appellant and Sue Neal again argued and Sue Neal told Appellant that she thought they should be apart and that either he needed to leave or she and Cody were leaving. (Tr. 3389, 3512). This is bolstered by Appellant calling his aunt looking for a place to stay a few days. (Tr. 3390, 3510-11).

Further, the State presented credible evidence that Appellant had the best and only opportunity to commit the crimes. Appellant had told India to lay on the bed in the  master bedroom that morning of the disappearance. (Tr. 3221; 3572). Later, India's blood was found on the comforter on the bed in the master bedroom. (Tr. 2176; 2386-89, 2693, 2695-96). Also, Appellant was home alone with the children after Sue Neal went to work on the morning of their disappearance. (Tr. 3220-23). Further, there was no evidence in the yard of children playing, such as toys, and neighbors testified that they had heard no children playing that day or anyone yelling for them. (Tr. 2763,3109-58). One neighbor testified that he drove by the Neals' residence at 11:00 a.m. and 12:45 p.m. and saw no activity in the Neals' yard. (Tr. 3154). The drive from the Neals' residence to the location where the children's bodies were found normally took only fifteen minutes. (Tr. 3186). Also, Appellant's location cannot be confirmed between 6:30 a.m. to 8:51 a.m. and again from 10:00 a.m. to 1:52 p.m., when Appellant made the 911 call. (Tr. 3163-67). Finally, the deputy coroner for Montgomery County testified that it takes less than five minutes to kill someone by asphyxia. (Tr. 3002-3003). Although the coroner could not confirm the exact manner of death, the jury could have inferred that Appellant had sufficient time to kill the children, transport them to the cemetery, and then develop his story about the children disappearing.

Also, the State presented two witnesses who testified that between 1:00 p.m. and 1:30 p.m. on the day the children disappeared, the children, Appellant, and the maroon Bonneville were not present at the Neals' residence. (Tr. 3280, 3283, 3286-88, 3305, 3307-09). This was in contrast to Appellant's statement to the 9-1-1 dispatcher at 1:52 p.m. that he had spent the last 30 to 40 minutes looking for the children, including being outdoors yelling for them. (Tr. 2664, 2660-62). Appellant also reiterated this story by telling police officers that he had last seen the children playing outside at 1:15 p.m. and that he went outside to search for the children around 1:15 p.m. or later. (Tr. 2746; 3222). In addition, a mechanic testified that the maroon Bonneville could be driven despite its brake problems. (Tr. 3093-

3095). Moreover, evidence was presented that the Bonneville had been driven recently and the vehicle was driven up to a tow truck. (Tr. 3091-92; 3432- 33, 3472-74). This contradicted Appellant's statement that the vehicle had not been driven in over a month because of its faulty brakes. (Tr. 3014).

Moreover, the State presented credible physical and circumstantial evidence connecting Appellant to the location where the children's bodies were found. The State presented evidence that on Cody's blanket grass seeds were found which were the same type of seeds found where the children's bodies were located but were not the same as the seeds found outside the Neals' residence. (Tr. 2177-78; 2422-25, 2467, 2493, 2527, 2622-25). Although there was conflicting expert testimony, the jury was free to weigh the expert's credibility and believe the evidence of the State that the plant from which the seeds came was not present at the Neal residence in 1997 because of the low levels of rainfall that year, whereas the site where the bodies were found was near a water source. (Tr. 2521, 2639-42). Moreover, the jury could have reasonably concluded that the blanket was used to move the bodies and that the murder must have occurred before July 14, 1997, because that was when the blanket was found. (Tr. 2174, 2177-78). Also, Kentucky Bluegrass seeds were found on Appellant's jeans and the seeds at the site of the bodies matched the maturity of the seeds on Appellant's jeans, whereas the seeds at the Neals' residence were not sufficiently high to produce grass seeds of the maturity of those found on Appellant. (Tr. 2174-75, 2381, 2425, 2467, 2624, 2633-35).

Also, the entomological data, presented in the testimony of Dr. Haskell provided evidence to the jury that the children died between July 9 and July 14, 1997. (Tr. 13, 2859-65, 2879) (see also Tr. 2156-58, 2160, 2168, 2190-93, 2213). Since Appellant was not incarcerated until July 23, 1997, he was available to commit the murders. (Tr. 3338). Additionally, the fact that the children's bodies were found near the grave of Sue Neal's mother indicates Appellant's guilt. Appellant knew where Sue Neal's mother was buried. (Tr. 3359). The children's bodies were found less than a hundred feet from the grave of Sue Neal's mother. (Tr. 3442). Further, the manner in which the children were positioned, naked on their backs with their genital areas exposed, could have been reasonably interpreted by the jury as a personal insult to Sue Neal. (Tr. 2184-85, 2186-87, 2192, 3439-40.)

Appellant had informed police that he had no enemies, had heard no car pull onto the property, heard no screams for help from India and

25

Cody, and that India would not get into a car with a stranger. (Tr. 3394-96). He had also told the police that he had placed on Cody a pair of black and white shoes with a Velcro strip. (Tr. 3349-50). The shoes were finally found on top of a trash pile behind the residence on August 2, 1997. (Tr. 3040-41). The area where the shoes were found had previously been searched with a canine unit on July 9 through July 14 and no shoes were present. (Tr. 3046-47). Appellant later identified the shoes as those that Cody had been wearing the day he disappeared. (Tr. 3353).

Also, the State presented competent, credible evidence demonstrating Appellant's guilty knowledge and feelings. A few weeks before the children's disappearance, Appellant told his cousin's wife that "it is easy to get rid of evidence." (Tr. 3326-27). Only seven days after the children disappeared, Appellant told his mother that he took the blame and wanted to kill himself. (Tr. 3555-56). Also, Appellant told his aunt that he had done something terrible and wanted to kill himself. (Tr. 3513). Only two days after the children had disappeared, Appellant told his sister-in-law that maybe he should confess but that "the only thing [he was] afraid of [was] the death penalty." (Tr. 3575). However, at only two days after the disappearance, no law enforcement officer suggested that a murder was suspected or discussed or suggested that the death penalty would be involved in the children's disappearance. (Tr. 2303-04, 2668, 3035, 3400). The jury could reasonably infer that the only reason Appellant was thinking about the death penalty was because he knew that the children were dead because he had killed them. Moreover, when Appellant was told that the children's bodies had been found, he showed no emotion and did not ask if the children were dead for some time, instead presuming that they were dead. (Tr. 3358-60).

Additionally, Appellant gave police and other investigators numerous false, contradictory and misleading information. At one point, Appellant insisted that he had called his ex-wife at 1:00 p.m. on the day of the children's disappearance, but there was no record of the call and his ex-wife stated that she was not at home at the time. (Tr. 3435, 3499-3501). Also, on the first day of the search, Appellant told investigators that no strange cars had pulled onto the property, but the next day, Appellant stated a blue Monte Carlo had pulled onto the property and gave a description of the occupants. (Tr. 3491-92). On the day of the children's disappearance, Appellant told his aunt that the reason she couldn't hear the children in the background as she normally would was because they were eating in the kitchen, but the Neals' kitchen did not have a table where the children could have been eating. (Tr. 3507, 3511-12, 3568). Appellant told the police that

he and Sue Neal had a long discussion the morning of the disappearance, concerning his plans for the day with the children. (Tr. 2748-49). Yet, Appellant told his family that he and Sue Neal had had a bitter fight that morning over their infidelities and that she had wanted him to move out. (Tr. 3389, 3512). Finally, Appellant also told police that on the day of the disappearance, the children began playing around 12:30 p.m., that he saw them playing at 1:15 p.m. and then missed them around 1:30 p.m. Moments later, Appellant told police that he first noticed the children missing around 12:30 p.m. (Tr. 2746, 2749). Appellant's oral and written statements to law enforcement contained numerous other contradictions. (Tr. 2751-53).

The above listed evidence presented by the State amounts to competent, credible evidence from which the jury could conclude that Appellant caused the death of Cody and India with prior calculation and design and that the deaths were a part of a course of conduct of killing two or more persons. Additionally, the evidence listed above provided competent credible evidence that Appellant abused the corpses of India and Cody by treating them in a manner which would outrage reasonable family and community sensibilities. Finally, the State's evidence was competent credible evidence that Appellant tampered with the evidence in this case. Therefore, based on the evidence presented at trial, we cannot say that the jury clearly lost its way in convicting Appellant of two counts of aggravated murder, four counts of abuse of a corpse, and one count of tampering with evidence. Also, we cannot say that a reasonable juror viewing the evidence in a light most favorable to the State could not have found Appellant guilty beyond a reasonable doubt. Appellant's convictions were not against the manifest weight of the evidence or supported by insufficient evidence. Appellant's sixth assignment of error is without merit and overruled.

*State v. Neal*, 2002 Ohio 6786, ¶¶ 59-71 (Ohio App. 2nd Dist. 2002).

An allegation that verdict was entered upon insufficient evidence states a claim under the

Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v.*

*Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *In re Winship*, 397 U.S. 358, 90

S. Ct. 1068, 25 L. Ed. 2d 368  (1970); *Johnson v. Coyle*, 200 F. 3d 987, 991 (6th Cir. 2000); *Bagby*

*v. Sowders,* 894 F. 2d 792, 794 (6th Cir. 1990)(en banc).   In order for a conviction to be

constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319. This rule was adopted as a matter of Ohio law in *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E. 2d 492 (1991). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

There appears to have been no question that these two children were murdered at about the same time. The question was who had done it. Judge Young's analysis of the evidence concluded that the State had shown Petitioner had a motive – recently expressed anger at the infidelities of their mother[2] – and the sole opportunity to have done the act on the morning the children disappeared. Other evidence also incriminated him – particularly many contradictory and inconsistent statements made after the disappearances and expressions of a consciousness of guilt of some deed sufficient to provoke thoughts of suicide.

Petitioner's Traverse does not focus on the evidence summarized by Judge Young, but instead on what the State did not show. Petitioner notes that there was no evidence of the children's bodies on the blue blanket which the State claimed was used to transport the bodies. However, there was evidence which the jury could have believed that seeds found on the blanket were present at the site where the bodies were found but not at the Neal residence. Petitioner points to no scientific

---

[2]The children's mother was married to Petitioner, but they were not his children.

28

evidence of record which would prove that a blanket such as the one in question could not be used to transport bodies without leaving a trace which would be found by whatever trace evidence techniques were used to test the blanket by the State and the defense. Without evidence at that level of detail, Petitioner is left to assert that a jury must have a reasonable doubt when there is an unexplained gap in the State's science.

Petitioner asserts that without the blanket there is no connection between Kevin Neal and the site where the bodies were found. Not so. Completely independent of the blanket is proof of the proximity of the discovered bodies to the grave of Sue Neal's mother and proof that Petitioner knew where that person was buried. That placement was consistent with the State's theory of motive: that Petitioner, in accordance with a prior statement admitted in evidence about how to hurt someone by hurting those she loved, had murdered the children and placed them where he did as an insult to his wife. Who else with a motive to hurt Sue Neal knew where her mother was buried and had an opportunity to murder her children and place their bodies where they were found?

Petitioner also focuses on the contradictions within the evidence about the odor of dead bodies and the absence of evidence of the bodies in the maroon car which the State theorized was used to transport the bodies. While lack of evidence to fully explain these facts is troubling, there absence does not mean that a reasonable juror could not have concluded, on the evidence which was presented, that Petitioner was the killer. For the conviction to withstand constitutional attack, there must be sufficient evidence of each element, not satisfactory explanations of all the factual puzzles which a case presents.

The sixth ground for relief should be denied on the merits.


**Ground Seven**

29

In his seventh ground for relief, Petitioner asserts he was deprived of a fundamentally fair trial by cumulative trial error. He relies on the foregoing six grounds for relief (which he repeats are each sufficient in themselves to warrant relief) and an additional nine alleged trial errors which are not encompassed in the six separately pled grounds for relief.

In his fourth supplemental assignment of error on direct appeal, Petitioner asserted that the accumulated trial errors made the trial unfair. Judge Young noted

> "[A]lthough violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." State v. DeMarco (1987), 31 Ohio St. 3d 191, 31 Ohio B. 390, 509 N.E.2d 1256, syllabus. The Court has expanded this rule to include the cumulative effect of all errors, not just evidentiary errors. State v. Garner, 74 Ohio St.3d 49, 64, 1995 Ohio 168, 656 N.E.2d 623.

*State v. Neal*, 2002 Ohio 6786, ¶101 (Ohio App. 2nd Dist., 2002). He also concluded that the few trial errors which the Court of Appeals had found did not cumulatively deprive the Petitioner of a fair trial. *Id.* at ¶102. Petitioner must then show that this is an unreasonable application of clearly established Supreme Court precedent.

The Sixth Circuit, however, has opined that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F. 3d 416, 447 (6th Cir. 2002). The same year the court held that "the Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F. 3d 598, 607 (6th Cir. 2002), citing *Lorraine v. Coyle, supra*. Therefore, the cumulation of the first six grounds for relief with the trial errors asserted in Ground Seven adds nothing to the claim.

Petitioner makes no constitutional argument for the claim. In his Petition, he merely sets out

the claimed trial errors without citation of authority.[3]  Then in his Traverse he merely incorporates

the text of the Petition.  (See Traverse, Doc. No. 12, at 11).  This is of little assistance to the Court

in evaluating this claim.

Petitioner asserts (Ground 7.1) that it was error to allow the jury to see a letter which had not

been properly authenticated.  The State admitted this error on appeal, but the Court of Appeals found

no prejudice.  Petitioner makes no argument to overcome that conclusion.

The unredacted consent-to-search form was admitted in evidence although it describes items

which were not found during the search.  Petitioner asserts (Ground 7.2) this was error, but the Court

of Appeals reasonably found Petitioner could not have been prejudiced by this.  Petitioner here

presents no additional argument and this Court agrees with the Court of Appeals: How could

Petitioner be prejudiced by having the jury learn that the police did not find incriminating evidence

they expected to find at his residence?

Petitioner asserts (Ground for Relief 7.3.a) that it was a violation of the hearsay rule to allow

FBI Agent Trombitas to testify what kind of items the children might buy in a bakery to cast doubt

on the possibility that they had been sighted in a bakery in Greenville.  When the testimony is

examined (Tr. at 3344), what Trombitas says is that the lead was not followed up on because what

the sighted children reportedly bought and what Sue Neal said the murdered children were likely

to buy were inconsistent.  As Judge Young noted, he was not called upon to testify what either the

witness or Ms. Neal said, but merely his or his agency's conclusions based on what was said.  While

it may be error for a court to allow a jury to rely on inadmissible hearsay, it is not error to allow a

---

[3]It is of course completely proper not to cite authority in a habeas petition.  The form for
the petition prescribed by the Rules Governing §2254 Cases specifically instructs the petitioner
not to cite cases.

jury to hear that the F.B.I. sometimes relies on hearsay. There was no hearsay in admitting this testimony.

Petitioner asserts (Ground 7.3.b) that the Sheriff's testimony about the location of Sue Neal's mother's grave was inadmissible hearsay. This claim was argued as a hearsay objection in the Court of Appeals and properly overruled because the Sheriff did not relate the out-of court statement of anyone about where the grave is located (Tr. 3442).[4]

Petitioner asserts (Ground 7.3.c) that it was error to admit a statement by Anne Daniel's that she had confirmed her information about plants with a Dr. Twig. The trial court and the Court of Appeals both agreed this was inadmissible hearsay, but the Court of Appeals also found there was no abuse of discretion in failing to strike it. Petitioner presents no argument at all about how this could have been prejudicial.

Petitioner asserts (Ground 7.3.d)[5] that Detective Gould was permitted to testify about statements made to her by Sue Neal about the state of the Neals' marriage. The Court of Appeals correctly held that there was no hearsay violation because Detective Gould did not testify about the content of the statements, but merely that they had been made and that they confirmed what she had heard from another officer.

Petitioner asserts (Ground 7.3.e) that the affidavits of Ms. Gragg and Ms. Wyatt were improperly admitted into evidence. The Court of Appeals agreed but found the error harmless since

---

[4]The objection made at trial was not hearsay, but lack of personal knowledge or proper foundation as required by Ohio R. Evid. 602. This objection was not pursued on appeal.

[5]In Ground 7.3.d, Petitioner also complains that Detective Gould was permitted to testify about her conversations with Libby Wyatt and Carolyn Gragg. Petitioner has provided no record reference on this matter and this Court's reading of the Court of Appeals' opinion has failed to disclose that it was raised on appeal.

they had repeated the substance of the affidavits in live testimony, subject to cross examination. Petitioner makes no contrary argument.

Petitioner asserts (Ground 7.3.f) that the Sheriff's testimony about how Ms. Neal's support for Petitioner wavered was inadmissible hearsay. The Court of Appeals correctly held this was not hearsay since it did not include the content of any statements.[6] This may have been irrelevant testimony, but the objection pursued on appeal was hearsay.

Finally, Petitioner asserts (Ground 7.3.g) that George Hawkins' trial testimony that he had previously told a jail deputy that he thought Kevin Neal had killed the children was both inadmissible hearsay and irrelevant opinion testimony. The latter objection was not preserved for appeal. As to the hearsay objection, the State defended admission of the statement on the grounds that it was a prior consistent statement offered to rebut a claim of recent fabrication. (State's Supplemental Brief, Ex. P. to Return of Writ, at 23). The Court of Appeals did not expressly rule on that point, found the comment to be hearsay, but concluded its admission was harmless. *State v. Neal*, ¶ 99. In this Court's opinion, the statement could properly have been admitted as a prior consistent statement. In any event, the statement did not stand alone: Hawkins testified about Neal's admissions and there was substantial additional evidence of guilt. Therefore the Court of Appeals' harmlessness finding is not contrary to clearly established federal law.

In sum, most of Petitioner's asserted evidentiary errors are not errors at all, even as a matter of Ohio evidentiary law. Federal habeas corpus is available only to correct federal constitutional

---

[6]Except the initial accusatory statement she made upon arriving home after she was told the children were missing. The Court of Appeals found "Shortly thereafter, Sue Neal raced into the driveway, clearly agitated and angry. Sue Neal jumped from the car and charged Appellant, stating, "Kevin, what the fuck have you done with my kids?" After an officer forced her back in her car, she again screamed, "What the fuck did you do to my kids?" *State v. Neal* at ¶5. The characterization of these comments as accusatory is plainly correct.

violations. 28 U.S.C. §2254(a); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982), *Barclay v. Florida*, 463 U.S. 939, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).

Evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial. *Cooper v. Sowders*, 837 F. 2d 284, 286 (6th Cir.1988); *Walker v. Engle,* 703 F. 2d 959, 962 (6th Cir. 1983); *Bell v. Arn,* 536 F. 2d 123 (6th Cir., 1976); *Burks v. Egeler*, 512 F. 2d 221, 223 (6th Cir. 1975). Where an evidentiary error is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. *Bugh v. Mitchell,* 329 F. 3d 496 (6th Cir. 2003), *citing Coleman v. Mitchell*, 244 F. 3d 533, 542 (6th Cir. 2000). Courts have, however, defined the category of infractions that violate fundamental fairness very narrowly. *Bugh, quoting Wright v. Dallman*, 999 F. 2d 174, 178 (6th Cir. 1993)(*quoting Dowling v. United States*, 493 U.S. 342, 352 (1990). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker,* 224 F. 3rd 542, 552 (6th Cir. 2000).

The evidentiary rulings complained of in Ground Seven, even to the extent erroneous as a matter of state law, neither individually nor collectively deprived Petitioner of a fair trial.

**Conclusion**

The Court finds no constitutional error among the seven Grounds for Relief in the Petition. It is therefore respectfully recommended that the Petition be dismissed with prejudice. Because these conclusions would not be debatable among reasonable jurists, Petitioner should be denied a certificate of appealability and leave to appeal *in forma pauperis*.

March 14, 2005.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).